UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TERESA PARSONS, | No. 3:12-cv-00083-HU |
| Plaintiff, | **FINDINGS AND RECOMMENDATION** |
| v. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant.[1] | |

Tim Wilborn, Wilborn Law Office, P.C., Las Vegas, Nevada, for Plaintiff Teresa Parsons.

S. Amanda Marshall, United States Attorney, District of Oregon, Portland, Oregon, for Defendant Carolyn W. Colvin.

Adrian Brown, Assistant United States Attorney, District of Oregon, Portland, Oregon, for Defendant Carolyn W. Colvin.

Leisa A. Wolf, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Seattle, Washington, for Defendant Carolyn W. Colvin.

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013, and is substituted in place of former Commissioner Michael J. Astrue as the defendant in this action. *See* FED. R. CIV. P. 25(d).

Page 1 - FINDINGS AND RECOMMENDATION

1  HUBEL, Magistrate Judge:

2   Teresa Parsons ("Parsons") seeks judicial review of a final
3  decision of the Commissioner of Social Security ("Commissioner")
4  denying her applications for disability insurance benefits ("DIB")
5  and supplemental security income benefits ("SSI") under Titles II
6  and XVI of the Social Security Act.  This court has jurisdiction to
7  review the Commissioner's decision pursuant to 42 U.S.C. § 405(g).
8  For the reasons set forth below, the Commissioner's decision should
9  be REVERSED and REMANDED for further proceedings.

10       **I. PROCEDURAL BACKGROUND**

11  Parsons applied for DIB and SSI benefits on January 29, 2008.
12 Both of Parsons' applications alleged a disability onset date of
13 November 1, 2006.  The applications were denied initially on June
14 17, 2008, and upon reconsideration on October 23, 2008.  Parsons
15 appeared and testified at a hearing held on February 26, 2010,
16 before Administrative Law Judge ("ALJ") Caroline Siderius.  The ALJ
17 issued a decision denying Parsons' claim for benefits on March 12,
18 2010.  Parsons then requested review of the ALJ's decision, which
19 was subsequently denied by the Appeals Council on November 14,
20 2011. As a result, the ALJ's decision became the final decision of
21 the Commissioner that is subject to judicial review.  This appeal
22 followed on January 17, 2012.

23       **II. FACTUAL BACKGROUND**

24  In March of 2005, Parsons visited her primary care physician,
25 Roger Reynolds ("Reynolds"), complaining of pain in her cervical
26 region and left shoulder area, which was interfering with her
27 ability to sleep.  Because Parsons' magnetic resonance imaging
28 ("MRI") revealed osteophytes and bulging discs, Reynolds diagnosed

Page 2 - FINDINGS AND RECOMMENDATION

1  Parsons with spinal stenosis in the cervical region.  Reynolds
2  thought Parsons should undergo a "trial" of physical therapy;
3  however, Parsons was losing her insurance coverage and could not
4  afford it on her own.

5      On September 30, 2005, Parsons was seen by Gail Swanstrom
6  ("Swanstrom"), Au.D., who conducted a battery of tests and
7  concluded that Parsons had "[d]efinitive" "[m]ixed [c]onductive
8  [a]nd [s]ensorineural [h]earing [l]oss." (Tr. 416.)

9      On April 3, 2006, Parsons saw Reynolds for a medication
10 review.  Reynolds' treatment notes indicate that Parsons was
11 suffering from fibromyalgia-related pain and depression.  Reynolds
12 decided to increase Parsons' dosage of Effexor and restart her
13 prescription for Amitriptyline—which had recently been discontinued
14 and may have exacerbated Parsons' pain symptoms.  Reynolds had also
15 increased Parsons' dosage of Effexor the month before, because she
16 reported that it was "working much better" and made her feel "like
17 she did 10 years ago." (Tr. 511.)  Around that time, Reynolds
18 indicated that he "believe[d] most of [Parsons'] symptoms [we]re
19 related to stress/anxiety/depression." (Tr. 512.)

20     On May 25, 2006, Parsons was seen by Stephen Thomas
21 ("Thomas"), M.D., at Aloha Orthopedic & Fracture Clinic.  At the
22 time of the examination, Parsons was 5'4" tall, weighed
23 approximately 216 pounds and "appear[ed] older than her stated age
24 of forty." (Tr. 427.)  Thomas concluded that "[f]rom an orthopedic
25 viewpoint [Parsons] . . . fit the criteria for fibromyalgia with
26 multiple trigger points and chronic pain." (Tr. 427.)  Thomas
27 ruled out osteoarthritis because there was no evidence of joint
28 swelling.  Thomas also indicated that he was "a little confused"

Page 3 - FINDINGS AND RECOMMENDATION

1  when Parsons told him "she was applying for supplemental income but

2  was given a form to apply for total disability."  (Tr. 426.)

3       On June 1, 2006, Thomas sent a letter to the Oregon Department

4  of Human Services, stating:

> I have reviewed my examination report.  Regarding tender
> trigger points and fibromyalgia she was tender
> everywhere.  She was tender at the occiput over both
> trapezius, over both rhomboids, over all the paraspinal
> muscles, and the cervical and thoracic region.  She was
> tender laterally over both shoulders, over both lateral
> epicondyles, over both greater trochanters, and lateral
> and medially at both knees.
>
> Regarding sensation, she had normal sensation to light
> touch on the hands and feet.
>
> I would point out I apparently did not check her reflexes
> or at least it is not marked down on my physical exam
> report.
>
> I would expect decreased endurance and decreased speed
> with functional movements but as you can see from the
> notes she is able to work twenty hours a week.  This is
> due mainly to her subjective complaint of fatigue.
>
> I would point out in reviewing the record there are
> really not any objective findings.  The only findings are
> subjective complaints of pain over multiple areas as
> mentioned above and chronic fatigue.

18 (Tr. 423.)

19      On May 21, 2007, Parsons visited Reynolds, who noted that

20 Parsons "continue[d] to have various aches and pains and [wa]s

21 having some in the right hip but [it] d[id] not radiate[.]"  (Tr.

22 497.)   Because Reynolds felt that "[m]uch of this [wa]s from

23 [Parsons'] fibromyalgia and lack of activity," he recommended

24 stretching and increased exercise and refilled Parsons's

25 prescription for Vicodin.  (Tr. 497.)  Around the same time,

26 Reynolds stated: "[I]t is difficult to know whether to put

27 [Parsons] through more tests or workup [in light of her underlying

28

Page 4 - FINDINGS AND RECOMMENDATION

1  psychiatric problems and fibromyalgia], especially now that she is
2  improving." (Tr. 498.)

3       On January 10, 2008, Parsons visited Reynolds, complaining of
4  bilateral leg pain. Reynolds' notations indicate that Parsons'
5  "leg pains ha[d] improved although there [wa]s still some
6  intermittent soreness and she complain[ed] of some continuing vague
7  fatigue and tiredness." (Tr. 743.) Apparently, Parsons was
8  "supposed to go back to work" at that time, but Reynolds "d[id] not
9  think [Parsons] [wa]s interested in doing that." (Tr. 743.)

10      On May 14, 2008, Parsons had a follow-up visit with Reynolds
11 regarding her bilateral leg pain. Reynolds noted that Parsons had
12 a long history of fibromyalgia, and went on to explain that
13 Parsons' x-rays and MRI's over the course of the last ten years
14 indicate that Parsons "has significant arthritis and [a]
15 degenerative disk in the neck and low back." (Tr. 740.)

16      On May 30, 2008, Parsons was seen by Andrew Pedersen
17 ("Pedersen"), M.D., for an otologic examination. In a letter to
18 the Oregon Department of Human Services, Pedersen indicated that
19 Parsons was suffering from "[d]ownsloping moderate sensorineural
20 hearing loss," but "[s]eem[ed] to do well with hearings aids." (Tr.
21 620.)

22      On June 6, 2008, Sharon Eder ("Eder"), M.D., a state agency
23 physician, completed a Physical Residual Functional Capacity
24 Assessment ("PRFCA"), wherein she concluded that Parsons (1) should
25 avoid concentrated exposure to noise (environmental limitations);
26 (2) was limited with respect to hearing (communicative
27 limitations); (3) had no visual or manipulative limitations; (4)
28 could occasionally stoop, crouch, crawl, and climb ramps/stairs and

Page 5 - FINDINGS AND RECOMMENDATION

1  ladder/ropes/scaffolds (postural limitations); (5) could frequently
2  balance and kneel (postural limitations); and (6) could carry
3  twenty pounds occasionally, ten pounds frequently, stand and/or
4  walk at least two hours in an eight-hour workday, sit about six
5  hours in the same time period, and push and/or pull "unlimited,
6  other than as shown for lift and/or carry" (extertional
7  limitations).  (Tr. 623.)

8       On July 25, 2008, neurologist Wan-jui Chen ("Chen"), M.D.,
9  Ph.D., sent a letter to Reynolds regarding a recent examination of
10  Parsons.  Chen noted that Parsons complained of pain and numbness
11  involving her right hand and right forearm.  Ultimately, Chen
12  concluded that Parsons "most likely suffers from right carpal
13  tunnel syndrome," and recommended that she continue using a wrist
14  brace.  (Tr. 638.)  Chen also noted that Parsons' examination
15  "showed asymmetric reflex at the left biceps and brachioradialis
16  tendons, which is consistent with a left C6 radiculopathy."  (Tr.
17  638.)  But Chen wanted to conduct a "work up with a neurophysiology
18  study of both upper extremities . . . to evaluate the severity of
19  the cervical radiculopathy."  (Tr. 638.)

20       On August 4, 2008, Parsons underwent a nerve conduction
21  velocity test, and Chen issued the following findings: (1)
22  "[m]oderate right carpal tunnel syndrome (median nerve entrapment
23  at wrist) affecting sensory and motor components"; (2) "[m]ild left
24  carpal tunnel syndrome (median nerve entrapment at wrist) affecting
25  sensory components"; and (3) "[m]ild cervical radiculopathy, most
26  likely at the left mid-cervical and lower cervical level."  (Tr.
27  640.)

28

Page 6 - FINDINGS AND RECOMMENDATION

1    On August 9, 2009, Parsons' boyfriend, Raymond Hergert

2 ("Hergert"), completed a third-party adult function report, wherein

3 he stated:

4        For the last [three] to [four] years [Teresa] has really
         slowed down from all activities.  She has a lot of pain

5        [and] moving around hurts her.  Sometimes she has to use
         a cane.  When shopping for grocer[ie]s sometimes [she]

6        has to use [an] electric cart.  She gets depressed and
         cannot sleep.  She does need to get more medical help and

7        she needs to see [a] mental health doctor for depression.
         She can't hold down a part[-]time or full[-]time job

8        because of her pain and joint movements.  She gets
         headache[s] a lot because of her neck, back, and leg

9        problems.

10       She gets depressed a lot because she can't do what she
         could before.  She [has] started getting where she can't

11       do much at all.

12 (Tr. 351.)

13    On August 29, 2008, Parsons' mother, Pearl Donley ("Donley")

14 completed a third-party adult function report.  Donley's closing

15 remarks were as follows:

16       I've notice[d] a lot of chang[e] in Teresa over the last
         [two] years.  She gets tired more often.  She has always

17       been a very active person, always going places and doing
         things for other people.  She has always been a hard

18       worker.  She has always had a job of some kind.  It
         upsets her when she can't do the things she used to do

19       without hurting and having to take med[ications] that put
         her to sleep in order to not have severe pain. . . . I

20       hope [this is] the last [time I have to fill this out].

21 (Tr. 307.)

22    On September 30, 2008, Chen referred Parsons to Sheldon Cober

23 ("Cober"), M.D., for a hand surgery consultation.  Cober indicated

24 that he believed "[Parsons'] clinical scenario . . . justif[ed]

25 proceeding with a right carpal tunnel release, and while [Parson]

26 [wa]s in the [operating room] [he] would proceed with [a] left

27 carpal tunnel steroid injection as an intervention which could

28 potentially give long-term relief."  (Tr. 779.)

Page 7 - FINDINGS AND RECOMMENDATION

On October, 14, 2008, Parsons was referred to Barbara Gibby-Smith ("Gibby-Smith"), Psy.D., by the Oregon Department of Human Services for a comprehensive psychodiagnostic examination.  During the examination, Parsons "completed a Mini Mental Status Exam with a score of 20 of 30," which indicates a moderate intellectual impairment.  (Tr. 652.)  She also "completed The Hooper Visual Organization Test with a score of 11 of 30, an indication of moderate organic impairment" that was consistent with Parsons' "brief information questionnaire (35%) and math questionnaire (40%)."  (Tr. 653.)  Gibby-Smith's diagnostic impressions included: dysthymia with an early onset of anxiety, a learning disorder, and a cognitive disorder (Axis I); fibromyalgia, carpal tunnel syndrome, and post-hysterectomy (Axis III); primary and environmental social problems, as well as employment problems (Axis IV); and a GAF of 55 (Axis V), which is indicative of "moderate limitations." *Bollinger v. Barnhart*, 178 F. App'x 745, 746 n.2 (9th Cir. 2006); *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 727 (9th Cir. 2011) (explaining that the claimant received a GAF "of 55 to 65, which indicates mild to moderate symptoms.")[2]

On October 22, 2008, a state agency psychiatrist, Dorothy Anderson ("Anderson"), Ph.D., completed a Psychiatric Review Technique Form, wherein she evaluated Parsons' impairments under listings 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.06 (anxiety-related disorders).  She concluded

---

[2] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998).

Page 8 - FINDINGS AND RECOMMENDATION

that the limitations imposed by Parsons' impairments failed to satisfy listing 12.02, 12.04 or 12.06.  That same day, Anderson completed a MRFCA that describes Parsons as "[m]oderately [l]imited" in five of twenty categories of mental activity and "[n]ot [s]ignificantly [l]imited" in fifteen.  (Tr. 675-76.) Overall, Anderson concluded that Parsons (1) will be "able to follow simple [instructions] and simple work-related decisions," (2) will be able "to respond appropriately to criticism," (3) wouldn't "require a special supervisory setting" or "have problems getting along with her co-workers and supervisors," and (4) would be "able to keep up with a work schedule [without] any problems, and [would have] no problems in a routine work environment."  (Tr. 677.)

In the ensuing months, Parsons saw Reynolds on several occasions regarding a variety of ailments, including continued fibromyalgia-related pain.  Of particular importance, Reynolds noted on April 6, 2009, that "increasing [Parsons'] dose of gabapentin ha[d] made a big difference in her fibromyalgia symptoms," and Parsons "seem[ed] to be quite pleased with that but [wa]s [still] having some sleep disturbance[.]"  (Tr. 721)  He also noted on August 28, 2009, that Parsons "obviously has . . . carpal tunnel syndrome which needs surgery."  (Tr. 715.)

On October 22, 2009, Reynolds referred Parsons to Gary Sultany ("Sultany"), M.D., for a rheumatology consultation.  After examining Parsons, Sultany concluded that Parsons' symptoms appeared consistent with fibromyalgia and that she appeared to have degenerative disc disease at the lumbar spine based on previous x-rays.  One of Sultany's recommendations was to increase Parsons'

Page 9 - FINDINGS AND RECOMMENDATION

1 dosage of "gabapentin up to 9 tablets in a day (3600 mg)."  (Tr.
2 775.)

3      On February 26, 2010, a hearing was held before the ALJ in
4 Portland, Oregon.  At the time of the hearing, Parsons was 43 years
5 old and lived in a trailer with Hergert and their three cats.
6 Parsons testified that she has a high school education, but dropped
7 out of college "because [she] didn't understand."  (Tr. 70.)
8 Parsons said she has not worked since applying for disability
9 benefits in late January 2008.  She experiences numbness in her
10 arms and fibromyalgia-related pain, which impacts her ability to
11 sleep, shower, get dressed, fix meals, and do chores.  Although
12 Parsons receives medical coverage under the Oregon Health Plan
13 ("OHP"), she has not been able to purchase new hearing aids or
14 undergo the recommended surgery to improve her carpal tunnel
15 syndrome based on a lack of insurance and financial resources.
16 Parsons uses a motorized scooter while grocery shopping and
17 estimates that she can only walk two to five minutes without
18 needing to stop and rest.  According to Parsons, from February 2005
19 to February 2007, she worked at an ice cream shop, where she
20 scooped ice cream and made popcorn and cotton candy.  Parsons could
21 only work on a part-time basis because she spent most of her time
22 standing and it would take her two to three days to physically
23 recover.

24      Also on February 26, 2010, the ALJ received testimony from
25 vocational expert ("VE") Kay Wise ("Wise").  The ALJ asked the VE
26 to consider a person of Parsons' age, education and vocational
27 background, who is able to "work at the light level" subject to the
28 following limitations:

Page 10 - FINDINGS AND RECOMMENDATION

> [This individual would require] a sit/stand option. Occasional climbing [of] ramps, stairs, ladders, ropes, and scaffolds; occasional stooping, crouching, and crawling; [and they would need to] avoid concentrated exposure to loud noises. They would [also] be limited to simple, repetitive, one- to three-step tasks with occasional changes in work setting.

(Tr. 79.)  After ruling out Parsons' past relevant work, the VE testified that an individual with these limitations could perform the jobs of packager of light products and office helper.  The VE then confirmed that such a hypothetical individual could *not* perform the jobs identified if they were limited to "occasional, but not constant, use of both hands for manipulation and fingering" because workers "need to use their hands bilaterally up to frequent in most of the light duty jobs that are unskilled." (Tr. 80.)

### III. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

**A.   Legal Standard**

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).  "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser*, 648 F.3d at 724.  Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal [one of the listed impairments]?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

1  *Keyser*, 648 F.3d at 724-25.  The claimant bears the burden of proof
2  for the first four steps in the process.  If the claimant fails to
3  meet the burden at any of those four steps, then the claimant is
4  not disabled.  *Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th
5  Cir. 2001); *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

6      The Commissioner bears the burden of proof at step five of the
7  process, where the Commissioner must show the claimant can perform
8  other work that exists in significant numbers in the national
9  economy, "taking into consideration the claimant's residual
10 functional capacity, age, education, and word experience." *Tackett
11 v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner
12 fails meet this burden, then the claimant is disabled, but if the
13 Commissioner proves the claimant is able to perform other work
14 which exists in the national economy, then the claimant is not
15 disabled.  *Bustamante*, 262 F.3d at 954 (citations omitted).

16 **B.    The ALJ's Decision**

17     At the first step of the five-step sequential evaluation
18 process, the ALJ found that Parsons had not engaged in substantial
19 gainful activity since November 1, 2006, the alleged disability
20 onset date.  At the second step, the ALJ found that Parsons had the
21 following severe impairments: fibromyalgia, hearing loss, obesity,
22 and depression.  At the third step, the ALJ found that Parsons'
23 combination of impairments were not the equivalent of any of the
24 impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1.  The
25 ALJ then assessed Parsons' residual functional capacity ("RFC") and
26 found she could perform a limited range of light work subject to
27 certain limitations, such as (1) she needs a sit/stand option; (2)
28 "she can occasionally climb ramps, stairs, ladders, ropes, and

Page 12 - FINDINGS AND RECOMMENDATION

1   scaffolds"; (3) "she can occasionally stoop, crouch, and crawl";
2   (4) "she should avoid concentrated exposure to loud noises"; (5)
3   "she is limited to simple, repetitive 1-3 step tasks"; and (6) "she
4   can have only occasional changes in work setting." (Tr. 22.)

5       At the fourth step, the ALJ found that Parsons is unable to
6   perform any past relevant work consisting of security work
7   (security guard), theater work (manager at a movie theater), and
8   fast food work (employee at an ice cream shop).   In light of
9   Parsons' age, education, work experience, and RFC, at the fifth
10  step, the ALJ found that there were jobs existing in significant
11  numbers in the national and local economy that she could perform,
12  including a packager of light products and officer job helper.
13  Based on the finding that Parsons could perform jobs existing in
14  significant numbers in the national economy, the ALJ concluded that
15  she was not disabled as defined in the Act from November 1, 2006
16  (the alleged disability onset date), through March 12, 2010 (the
17  date of the ALJ's decision).

## IV. STANDARD OF REVIEW

19      The court may set aside a denial of benefits only if the
20  Commissioner's findings are "'not supported by substantial evidence
21  or [are] based on legal error.'"  *Bray v. Comm'r Soc. Sec. Admin.*,
22  554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec.*
23  *Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).  Substantial evidence
24  is "'more than a mere scintilla but less than a preponderance; it
25  is such relevant evidence as a reasonable mind might accept as
26  adequate to support a conclusion.'" *Bray*, 554 F.3d at 1222 (quoting
27  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

28

1    The court "cannot affirm the Commissioner's decision 'simply
2    by isolating a specific quantum of supporting evidence.'" *Holohan*
3    *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*,
4    180 F.3d at 1097).   Instead, the court must consider the entire
5    record, weighing both the evidence that supports the Commissioner's
6    conclusions, and the evidence that detracts from those conclusions.
7    *Holohan*, 246 F.3d at 1097.  However, if the evidence as a whole can
8    support more than one rational interpretation, the ALJ's decision
9    must be upheld; the court may not substitute its judgment for the
10   ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d
11   1149, 1152 (9th Cir. 2007)).

12                           **V. DISCUSSION**

13       On appeal, Parsons essentially offers four reasons why the
14   Court should reverse the Commissioner's decision: (1) the ALJ erred
15   in failing to find that Parsons' carpal tunnel syndrome and
16   degenerative disc disease were severe impairments; (2) the ALJ
17   improperly rejected Thomas' opinion; (3) the ALJ improperly
18   rejected Parsons' testimony; and (4) the ALJ improperly rejected
19   lay witness statements.

20   **A.   Step-Two Severity Findings**

21       In *Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996), the Ninth
22   Circuit explained that "the step-two inquiry is a de minimis
23   screening device to dispose of groundless claims." *Id.* at 1290.
24   "An impairment . . . can be found not severe only if the evidence
25   establishes a slight abnormality that has no more than a minimal
26   effect on an individual's ability to work." *Id.* (internal
27   quotation marks and citations omitted); *see also* 20 C.F.R. §
28   404.1520(c) (explaining that a severe impairment "significantly

Page 14 - FINDINGS AND RECOMMENDATION

1 limits your physical or mental ability to do basic work
2 activities"). Basic work activities include "[p]hysical functions
3 such as walking, standing, sitting, lifting, pushing, pulling,
4 reaching, carrying, or *handling*[.]" 20 C.F.R. § 404.1521(b)
5 (emphasis added).

6      As Judge Papak recently explained, however, "if the ALJ
7 resolves step two in the claimant's favor and properly considers
8 limitations imposed by the impairment at other steps of the
9 sequential process, then the ALJ's erroneous findings that an
10 impairment is non-severe constitutes harmless error." *Eastman v.*
11 *Astrue*, No. 3:11-cv-00701-PK, 2012 WL 4052411, at *6 (D. Or. Aug.
12 21, 2012); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)
13 (failure to list an impairment as severe at step two was harmless
14 error where the ALJ considered the functional limitations posed by
15 that impairment later in the decision).

16      As discussed above, at step two of the sequential evaluation
17 process, the ALJ determined that Parsons' had the following severe
18 impairments: fibromyalgia, hearing loss, obesity and depression.
19 The ALJ went on to acknowledge that medical records reflected that
20 Parsons had been diagnosed with carpal tunnel syndrome. However,
21 the ALJ determined that Parsons' carpal tunnel syndrome was a non-
22 severe impairment because (1) Parsons testified that she does not
23 wear her brace, despite Chen recommending that she do so; and (2)
24 the ALJ observed Parsons "making gestures with her arms and hands
25 throughout the hearing without any apparent discomfort or pain,"
26 which suggested to the ALJ that Parsons' "carpal tunnel symptoms
27 [were] not as limiting as she alleged." (Tr. 20.)
28 *///*

Page 15 - FINDINGS AND RECOMMENDATION

**1.   Carpal Tunnel Syndrome**

The Court agrees with Parsons that the ALJ erred in failing to find that her carpal tunnel syndrome was a severe impairment. Indeed, the medical evidence seems quite clear on this point: Chen examined Parsons on July 25, 2008, and determined that she "most likely suffers from right carpal tunnel syndrome." (Tr. 638.)   On August 4, 2008, Parsons underwent a nerve conduction velocity test, and Chen concluded that she had "[m]oderate right carpal tunnel syndrome (median nerve entrapment at wrist) affecting sensory and motor components" and "[m]ild left carpal tunnel syndrome (median nerve entrapment at wrist) affecting sensory components."  (Tr. 640.)  On September 30, 2008, Parsons saw Cober for a hand surgery consultation.   Cober indicated that he believed "[Parsons'] clinical scenario . . . justif[ed] proceeding with a right carpal tunnel release, and while [Parson] [wa]s in the [operating room] [he] would proceed with [a] left carpal tunnel steroid injection as an intervention which could potentially give long-term relief." (Tr. 779.)   On August 28, 2009, Parsons' long-term primary care physician noted that she "obviously has . . . carpal tunnel syndrome which needs surgery."  (Tr. 715.)[3]

It is true, as the ALJ noted, that Chen recommended that Parsons "*continue* using the wrist brace for her *right* carpal tunnel syndrome."  (Tr. 638) (emphasis added).   At the time of Chen's initial examination, however, Parsons had already "been using a wrist brace" based on the belief that she was suffering from carpal

---

[3] During the hearing before the ALJ, Parsons testified that she has not undergone carpal tunnel surgery due to a lack of insurance and financial resources.

Page 16 - FINDINGS AND RECOMMENDATION

1  tunnel syndrome of the right wrist, and Chen cautioned her about
2  "put[ting] it on too tight." (Tr. 637-38.) The fact that Chen
3  endorsed (or recommended) the precautionary measures Parsons took
4  on her own accord does not undermine the legitimacy of an
5  impairment that physicians believe requires surgical intervention.
6  Nor should the ALJ's own observations regarding Parsons' ability to
7  make "gestures with her arms and hands . . . without any apparent
8  discomfort or pain." (Tr. 20.) After all, "[t]he ALJ is not a
9  doctor, and [s]he is not qualified to make h[er] own determinations
10 [as to] the physical capabilities of [the claimant]." *Soper v.*
11 *Astrue*, No. CV 10-04521-MAN, 2011 WL 3205412, at *8 (C.D. Cal. July
12 26, 2011).

13      Contrary to the Commissioner's assertion, the Court cannot say
14 that this error was harmless. It is well settled that the
15 hypothetical an ALJ poses to a VE, which derives from the RFC, must
16 set out all the limitations and restrictions of the particular
17 claimant. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988); *Moua*
18 *v. Astrue*, CIV S-07-2024 GGH, 2009 WL 997104, at *11 (E.D. Cal.
19 Apr. 14, 2009) (stating that "substantial evidence must support the
20 hypothetical which ultimately serves as the basis for the ALJ's
21 determination.") Here, the ALJ posed two hypotheticals to the VE.
22 First, the ALJ asked the VE to consider a person of Parsons' age,
23 education and vocational background, who is able to "work at the
24 light level" subject to the limitations set forth in Parsons' RFC.[4]

25

26      [4] Parsons' RFC includes the following limitations: she needs
27 a sit/stand option; she can occasionally climb ramps, stairs,
   ladders, ropes, and scaffolds; she can occasionally stoop, crouch,
   and crawl; she should avoid concentrated exposure to loud noises;
28 she is limited to simple, repetitive 1-3 step tasks; and she can

Page 17 - FINDINGS AND RECOMMENDATION

1  After ruling out Parsons' past relevant work, the VE testified that
2  an individual with these limitations could perform the jobs of
3  packager of light products and office helper. Second, the ALJ asked
4  the VE to consider the same hypothetical individual, who was
5  limited to "occasional, but not constant, use of both hands for
6  manipulation and fingering." (Tr. 80.)  The VE confirmed that such
7  a hypothetical individual could *not* perform the jobs previously
8  identified because workers "need to use their hands bilaterally up
9  to frequent in most of the light duty jobs that are unskilled."
10 (Tr. 80.)

11       Ultimately, the first hypothetical served as the basis for the
12 ALJ's disability determination.  What is not clear to the Court is
13 whether the ALJ was attempting to account for any limitations that
14 would have flowed from Parsons' carpal tunnel syndrome in
15 formulating the second hypothetical posed to the VE.  If this was
16 the ALJ's intent, it would seem axiomatic that the first
17 hypothetical did not set out all of Parsons' limitations and
18 restrictions, as required under *Embrey*.  Nor is it clear to Court
19 to what extent Parsons' carpal tunnel syndrome would limit her
20 ability function in a work setting, because all of the physical
21 examinations that shed light on such matters (i.e., examinations
22 discussing manipulative limitations and the ability to handle small
23 and/or large objects) predate the evidence in the record regarding
24 Parsons' carpal tunnel syndrome and appear inconsistent with such
25 a diagnoses.  For example, on May 25, 2006, Thomas examined Parsons
26 and determined that she had "no limitation of her upper

27
28 have only occasional changes in work setting.

Page 18 - FINDINGS AND RECOMMENDATION

extremities" and "no limitation with handling small or large objects."**5** (Tr. 427)  Similarly, on June 6, 2008, Eder completed PRFCA's indicating Parsons had no manipulative limitations.  Yet, on July 25, 2008, Chen examined Parsons and determined that she "most likely suffers from right carpal tunnel syndrome."  (Tr. 638.)  This was confirmed by a nerve conduction velocity test administered by Chen on August 4, 2008, a consultation with a hand surgeon on September 30, 2008, and treatment notes issued by Parsons' long-term primary care physician on August 28, 2009.

In short, the Court concludes that ALJ's error at step two was not harmless, and recommends that this case be remanded so that the ALJ can address the ambiguities and material inconsistencies described above.  On remand, the ALJ should better develop the record regarding what, if any, manipulative, handling and/or fingering limitations the bilateral carpal tunnel syndrome caused for Parsons.  This will provide the necessary framework to formulate a VE hypothetical that sets out all of Parsons' limitations and restrictions.**6**

---

**5** Under Ninth Circuit case law, "[m]edical opinions that predate the alleged onset of disability are of *limited* relevance." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (emphasis added).  Although the Court will treat medical opinions that predate the allege onset date in accordance with *Carmickle,* the Court also notes that both parties have relied on such evidence in support of their respective positions. (*See* Pl.'s Opening Br. at 11, 13) (relying on a physician's March 17, 2005 interpretation of an MRI of Parsons' cervical spine, and arguing the ALJ improperly rejected a portion of Thomas' opinion that predated the disability onset date); (Def.'s Br. at 6) (relying on Thomas's May 25, 2006 examination results).

**6** In light of this finding, it is not necessary to address Parsons' argument that the jobs of packager of light goods and office helper are inconsistent with her RFC.  The correctly developed RFC on remand will no doubt result in a different

### 2. Degenerative Disc Disease

Parsons alleges error with respect to the ALJ's handling of her degenerative disc disease. She does not dispute that the ALJ considered and/or specifically addressed the evidence regarding her degenerative disc disease. (*See* Pl.'s Opening Br. at 12) ("Although the ALJ acknowledged the MRI results, the ALJ did not provide any reasons for failing to find Plaintiff's degenerative disc disease to be a severe impairment. . . . The ALJ's failure to find the degenerative disc disease to be a severe impairment negatively impacted . . . Plaintiff's RFC.") In her opening brief, Parsons does not explain how this impairment, either alone or in combination with her other impairments, limited her functional capacity and resulted in the hypothetical question posed to the VE being an error. Without more, the Court cannot conclude that this argument identifies a separate error in the ALJ's decision. *See Williams v. Astrue*, No. EDCV 10-1827 JC, 2011 WL 3319536, at *3 (C.D. Cal. July 29, 2011) ("ALJ's failure to consider plaintiff's [impairment] in relation to residual functional capacity [was] proper because plaintiff failed to show how [the impairment] in combination with another impairment increased severity of limitations" (quoting *Hoffman v. Astrue*, 266 F. App'x 623, 625 (9th Cir. 2008))); *see also Burton v. Astrue*, 310 F. App'x 960, 961 n.1 (9th Cir. 2009) (rejecting the plaintiff's argument that ALJ failed to adequately consider an impairment because the plaintiff failed to specify how the impairment limited his functional capacity or

hypothetical and response by the VE.

1 how it exacerbated his currently existing condition, noting the
2 ALJ's consideration of the impairment in overall assessment).

3     After the Commissioner pointed this deficiency out to Parsons,
4 she appeared to argue for the first time in her reply brief that
5 the sit/stand option set forth in the RFC does not adequately
6 encompass the limitations that flow from her degenerative disc
7 disease. (*See* Pl.'s Reply Br. at 6) ("[T]he ALJ did not . . . make
8 any findings which reflect the limitations which are caused
9 by . . . spinal degenerative disc disease. . . . Plaintiff
10 testified that, due to pain, she is severely limited in her ability
11 to stand, or even stand and sit in alternation as was allowed on
12 her prior part-time job. The ALJ's [RFC] capacity finding contains
13 no limitation on standing, other than an unquantified need to be
14 able to alternate positions. This does not accommodate the
15 limitations Plaintiff attributed to her pain.")  The Court simply
16 notes that (1) it "need not consider arguments raised for the first
17 time in a reply brief," *Hofmann v. Astrue*, No. CV-08-00985-PHX-GMS,
18 2009 WL 2486011, at *8 n.6 (D. Ariz. Aug. 12, 2009), (2) the degree
19 of limitation described by Parsons is an insufficient basis to find
20 reversible error here because the ALJ provided clear and convincing
21 reasons for discrediting Parsons' symptom testimony, *see infra* Part
22 V.C., and (3) an assessment prepared after Parsons' alleged
23 disability onset date (Eder's June 2008 PRFCA) indicates that
24 Parsons can stand and/or walk at least two hours in an eight-hour
25 workday and sit (with normal breaks) for a total of about six hours
26 in an eight-hour work day, (Tr. 623), which appears to conflict
27 with the degree of limitation described by Parsons.
28 *///*

Page 21 - FINDINGS AND RECOMMENDATION

**B.   Medical Source Statements**

In her opening brief, Parsons argues that the ALJ failed to provide clear and convincing reasons for rejecting a portion of Thomas' opinion—which she claims provides a basis for altering the ALJ's ultimate RFC determination.  Even assuming for the sake of argument that the ALJ rejected a portion of Thomas' opinion, as Parsons posits, it is inescapable that Thomas' opinion predates the alleged disability onset.  The Ninth Circuit addressed a very similar argument in *Carmickle*, where the claimant argued that the ALJ erred in rejecting medical evidence from an examining physician, Dr. Nilaver.  *Carmickle*, 533 F.3d at 1165.  The ALJ gave little weight to Dr. Nilaver's opinion because it was provided before the claimant's alleged disability onset date.  *Id.*  Because such opinions are of limited relevance, the Ninth Circuit concluded that the ALJ did not err in his treatment of Dr. Nilaver's evidence.  *Id.*  As in *Carmickle*, the Court concludes that the ALJ did not err in her treatment of Thomas' opinion, or alternatively, if she did, the error was harmless.[7]

*///*

---

[7] Oddly enough, Parsons advanced an argument in her reply brief that supports the conclusion that *Carmickle* should be applied to the ALJ's treatment of Thomas' opinion.  More specifically, Parsons criticized the Commissioner for even citing Thomas' opinion in support of her position that the ALJ's adverse credibility determination (concerning Parsons) was proper: "In support of that assertion, the Commissioner cited the one-time consultative examination performed by Dr. Stephen Thomas several months BEFORE Plaintiff's alleged date of disability."  (Pl.'s Reply Br. at 1.)  Parsons went on to state: "Because Dr. Thomas' assessment was given before Plaintiff even alleges that she became disabled, and because it did not consider all of her later-documented impairments in combination, *it is of little value in determining Plaintiff's overall capacity for purposes of her disability claim*."  (Pl's Reply Br. at 1-2) (emphasis added).

Page 22 - FINDINGS AND RECOMMENDATION

## C.   Adverse Credibility Determination

In *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595 (9th Cir. 1999), the Ninth Circuit explained what is required of an ALJ in order to discredit a claimant's symptom testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints.

*Id.* at 599 (citations omitted).   Ninth Circuit case law demonstrates that clear and convincing reasons "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *Ramirez v. Comm'r Soc. Sec. Admin.*, No. 09-684-KI, 2010 WL 4683847, at *20 (D. Or. Nov. 10, 2010) (same), *aff'd*, 463 F. App'x 640 (9th Cir. 2011).

In her written decision, the ALJ provided several clear and convincing reasons for discrediting Parsons' testimony. First, and perhaps most notably, the ALJ cited examples in the record indicating that Parsons responded favorably to medical treatment. For example, on April 17, 2007, Reynolds completed a treatment note indicating that Parsons' condition "[wa]s improving." (Tr. 498.) In August and October 2007, Reynolds reported that Parsons showed "good symptomatic and objective improvement" to her lower thoracic

1  and lumbar regions after receiving osteopathic manipulative
2  therapy. (Tr. 488, 491-92.)  In fact, although Parsons experienced
3  associated muscle aches and pain, she was even able to be
4  "physically active more" (as recommended by Reynolds) and take care
5  of her grandchildren around that time. (Tr. 491.)

6       On October 18, 2007, Reynolds noted that "[t]he
7  gabapentin . . . [wa]s working" to treat Parsons' pain. (Tr. 489.)
8  On January 10, 2008, Reynolds noted that Parsons' "leg pains ha[d]
9  improved," even though she still had "some intermittent soreness"
10 and "complain[ed] of some continuing *vague* fatigue and tiredness."
11 (Tr. 743) (emphasis added).  And, in April 2009, Reynolds reported
12 that "increasing [Parsons'] dose of gabapentin ha[d] made a big
13 difference in her fibromyalgia symptoms[.]"  (Tr. 721.)

14      Second, the ALJ cited conflicting medical evidence. For
15 example, the ALJ noted that Parsons alleged that she is unable to
16 work based on "fibromyalgia, hearing loss, [and] pain and weakness
17 in [her] legs."  (Tr. 235.)   The ALJ concluded that Parsons'
18 statements concerning the intensity, persistence and limiting
19 effects of such symptoms were not credible to the extent they were
20 inconsistent with the RFC—which the ALJ indicated was supported by
21 the objective medical evidence, such as the opinion of Eder. *See*
22 *generally Black v. Astrue*, No. 3:10-cv-06409-MO, 2011 WL 6130534,
23 at * 6 (D. Or. Dec. 7, 2011) ("There is nothing wrong with an ALJ
24 stating a conclusion and then explaining it, as opposed to
25 providing explanation and then reaching a conclusion.")   Eder
26 completed a PRFCA on June 6, 2008, indicating that Parsons can
27 occasionally stoop, crouch, and climb ramps and stairs; frequently
28 balance and kneel; and stand and/or walk at least two hours in an

Page 24 - FINDINGS AND RECOMMENDATION

eight-hour workday.  The degree of limitation described by Eder conflicts with the degree of limitation described by Parsons. Parsons alleges that it takes her "about one or two hours just to get dress[ed]" in the morning; that she "cannot [even] s[t]and over [the] stove to cook"; that she cannot squat; and that she falls over if she bends at the waist.[8]  (Tr. 310, 312, 315.)  Clearly the medical evidence provided by Eder conflicts with Parsons' testimony.

Third and finally, the ALJ utilized "ordinary techniques of credibility evaluation."  *Smolen*, 80 F.3d at 1284.  The ALJ observed that Parsons made "gestures with her arms and hands throughout the hearing without any apparent discomfort or pain," which "undermine[d] . . . [Parsons'] credibility regarding the severity of her symptoms."  (Tr. 25); (Tr. 68) ("Q. So you were sort of demonstrating having your, your arm up and then like a brush through your hair? A. Right.")  This observation seems entirely appropriate when you consider that Parsons says, for example, that she needs "somebody to help . . . brush" her hair. (Tr. 68.)[9]

To elaborate, in the Court's view, it was appropriate for the ALJ to make this observation (for a second time, later on in her

---

[8] Parsons' offered conflicting testimony during the hearing. (Tr. 65) ("I squat a little bit when I'm getting my pots and pans out.")

[9] During the hearing before the ALJ, Parsons attributed the difficulty she experiences to "[t]he tiredness, the muscles, the -- it aches throughout the whole neck and the body," not her carpal tunnel syndrome.  (Tr. 68.)  She also said that "[s]ometimes [she] ha[s] a hard time reaching up and brushing the hair, or even holding it out and brushing it."  (Tr. 69.)

Page 25 - FINDINGS AND RECOMMENDATION

1 decision) while assessing the credibility of Parsons' statements
2 concerning the intensity, persistence and limiting effects of her
3 symptoms (as she did), as opposed using it as a basis for
4 determining that Parsons' carpal tunnel syndrome was a non-severe
5 impairment (as she also did)—even though the ALJ is not a medical
6 doctor.  Indeed, Ninth Circuit case law demonstrates that clear and
7 convincing reasons include, inter alia, inconsistencies in the
8 claimant's testimony.

9     In short, the Court concludes that the ALJ did not err in
10 concluding that Parsons' allegations of disabling pain were not
11 fully credible.

12 **D.   Lay Witness Statements**

13     In determining whether a claimant is disabled, an ALJ is
14 required to consider lay witness testimony concerning a claimant's
15 ability to work.  *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir.
16 2009).  Such testimony is competent evidence which cannot be
17 disregarded without providing specific reasons that are germane to
18 each witness.  *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1054
19 (9th Cir. 2006).  Germane reasons for rejecting a lay witness's
20 testimony include "[i]nconsistency with medical evidence," *Bayliss
21 v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005), and
22 inconsistencies between the lay witness's testimony and the
23 claimant's presentation to treating physicians or the claimant's
24 activities of daily living.  *Barber v. Astrue*, No. 1:10-cv-01432-
25 AWI-SKO, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012).

26     The lay witness statements at issue here are Hergert's and
27 Donley's.  In her written decision, the ALJ acknowledged that she
28

Page 26 - FINDINGS AND RECOMMENDATION

1 considered the function reports submitted by Donley and Hergert.

2 The ALJ's entire discussion of Donley's testimony is as follows:

> 3 Ms. Donley reported that the claimant has difficulty
> lifting heavy items, has pain when she reaches overhead,
> 4 and cannot walk as far as she used to. However, she also
> reported that the claimant cooks, does laundry, cleans
> 5 her house, shops in stores, feeds her cat and cleans the
> litter box, and cooks from scratch. Some weight is given
> 6 to Ms. Donley's assessment of the claimant. The
> activities of daily living and limitations noted are not
> 7 consistent with the [RFC] reached in this decision.

8 (Tr. 25.)  With respect to Hergert, the ALJ stated:

> 9 Mr. Hergert reported that the claimant has some
> exertional limitations, difficulty using her hands, and
> 10 difficulty with concentration due to pain. However, he
> also reported that the claimant washes dishes with rest
> 11 breaks daily, prepares simple meals, vacuums and does
> laundry once per week, and shops once or twice per week
> 12 for one hour. Some weight is also given to Mr. Hergert's
> assessment of the claimant. However, the severity of
> 13 limitations noted by Mr. Hergert are not supported by the
> objective evidence of record, and are somewhat
> 14 inconsistent with the claimant's [ADL's].

15 (Tr. 25.)

16   Here, a review of the record reveals that testimony provided

17 by Donley and Hergert is quite similar to that which was provided

18 by Parsons.  The Ninth Circuit has "held that when an ALJ provides

19 clear and convincing reasons for rejecting the credibility of a

20 claimant's own subjective complaints, and the lay-witness testimony

21 is similar to the claimant's complaints, it follows that the ALJ

22 gives 'germane reasons for rejecting' the lay testimony." *Williams*

23 *v. Astrue*, 493 F. App'x 866, 869 (9th Cir. 2012) (quoting *Valentine*

24 *v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009));

25 *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012) (citing

26 *Valentine* for the same proposition).  In accordance with *Molina,*

27 *Williams* and *Valentine*, the Court concludes that the ALJ provided

28 germane reasons for discrediting Donley's and Hergert's testimony.

Page 27 - FINDINGS AND RECOMMENDATION

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's decision should be REVERSED and REMANDED for further proceedings.

## VII. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due **July 29, 2013.**  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.  If objections are filed, then a response is due **August 15, 2013.**  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 9th day of July, 2013.

/s/ Dennis J. Hubel

_____

DENNIS J. HUBEL
United States Magistrate Judge

Page 28 - FINDINGS AND RECOMMENDATION